# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### Assigned on Briefs September 22, 2004

## STATE OF TENNESSEE v. MICHAEL MCKELLAR

**Appeal from the Circuit Court for Humphreys County & Cheatham County**
**No. 10277 (Humphreys) 14017 (Cheatham)    Robert E. Burch, Judge**

---

### No. M2003-02308-CCA-R3-CD - Filed January 31, 2005

---

The appellant, Michael McKellar, pled nolo contendere to multiple charges of theft of property between $10,000 and $60,000 arising from indictments in both Cheatham County and Humphreys County where the appellant and a partner solicited funds from investors to finance the purchase of a defaulted Nigerian oil contract. In Cheatham County, the appellant was sentenced to a three (3) year sentence in the Tennessee Department of Correction, but the sentence was suspended. In Humphreys County, the appellant was sentenced to a four (4) year sentence in the Tennessee Department of Correction. The Humphreys County sentence was also suspended. After a joint restitution hearing, the trial court ordered the appellant to pay restitution to one of the victims in Cheatham County in the amount of $1,000 and to one of the victims in Humphreys County in the amount of $22,900 based on finding that the appellant had converted that amount of money to his own personal use. On appeal, the appellant argues that the evidence presented at the restitution hearing was insufficient to support the award of restitution and that the trial court erred in ordering the appellant to pay restitution without making specific findings or reviewing evidence of the appellant's ability to pay the restitution. Because we hold the trial court erred in determining the amount of restitution by focusing on whether the appellant had converted the money for his own use rather than the actual pecuniary loss suffered by the victims and because the trial court did not make specific findings regarding the appellant's ability to pay restitution, we remand for a new restitution hearing.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Trial Court is Reversed and Remanded.

JERRY L. SMITH, J., delivered the opinion of the court, in which DAVID G. HAYES, J., joined and THOMAS T. WOODALL, J., not participating.

Richard D. Taylor, Jr., Assistant Public Defender, Ashland City, Tennessee, for the appellant, Michael McKellar

Paul G. Summers, Attorney General & Reporter; Elizabeth T. Ryan, Assistant Attorney General; Dan Alsobrooks, District Attorney General; and Lisa Donegan, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

<u>Factual Background</u>

On August 6, 2002, the Cheatham County Grand jury returned an indictment against the appellant charging him with theft of property between $10,000 and $60,000. The indictment alleged that the appellant had "unlawfully, knowingly and feloniously obtain[ed] or exercise[d] control" of money belonging to various individuals in Cheatham County. The indictment specified ten separate individuals and amounts of money ranging from $1,000 to $9,500 per individual. A separate indictment was returned by the Humphreys County Grand Jury again charging the appellant with theft of property between $10,000 and $60,000.[1]

The appellant subsequently entered a plea of nolo contendere pursuant to Tennessee Code Annotated section 40-35-313 to the charges in both Cheatham County and Humphreys County. At the plea hearing, which was held in Humphreys County, the trial court accepted pleas from the appellant in both cases.[2] The parties agreed that restitution would be determined at a hearing and "distributed on a prorata basis among the different victims in the different counts, even those being nolled." The State summarized the facts of the case as follows:

> [The appellant] and - - and a con - - another gentleman, who has been tried - - I believe found not guilty - - engaged in a[n] investment scheme, wherein they solicited funds from individuals, telling the individuals that that money was going to Nigeria, it was investment purposes for Nigerian oil wells, promised a huge return on their dollar and, then, turned around - - Some of that money did go to some other parties, but a huge portion of it, was well, was diverted to . . . [the appellant's] personal use.

At the joint restitution hearing on August 28, 2003, the trial court heard testimony from Alan Tarpley, an investigator for the District Attorney General's office, and the appellant. At that hearing, it was revealed that in 1999, the appellant started an internet company called M. McKellar dot com. After successfully selling products on the internet, the appellant was interested in investing some of his money. He somehow learned that he could purchase a defaulted Nigerian oil line contract. The appellant was told by someone he met on the internet that a German company had contracted in

---

[1] The record on appeal does not contain a copy of the indictment returned in Humphreys County. Thus, we are unaware of the number of victims or the total amount of money involved in the Humphreys County indictment.

[2] In the Humphreys County case, the appellant pled nolo contendere to Count 1 of the indictment and Counts 2 through 7 were nolled. In the Cheatham County case, the appellant pled nolo contendere to the indictment. Again, due to the failure of the appellant to include the Humphreys County indictment in the record, we are unaware of the exact nature of the plea.

Nigeria to build an oil line between wells and had breached their contract. The appellant was told that he could buy the remainder of the contract for a minimal amount of money and receive a $25 million dollar return on his investment.

In the early months of 2000, the appellant went to Toronto, Canada, where he met a man named "Milo." The appellant entered into a contract to share the proceeds of the German contract for Milo's company's assistance. The appellant also enlisted the help of his former co-worker, Paul Smith. Smith and the appellant retained legal counsel in Nigeria with the assistance of Milo.

In March of 2000, the appellant crushed his hand in an accident at work. The appellant received worker's compensation benefits for an entire year, eventually settling with his employer in March of 2001. During the vast majority of this time, the Nigerian prospect lay fallow.

Sometime late in 2000, the Canadian partner requested a $17,000 payment. The appellant and Smith traveled to Canada, taking the cash with them. The appellant claimed that the cash taken to Canada originated from money that Smith had collected from Cheatham County investors.

In February of 2001, Smith and the appellant again traveled to Canada where they met with a man known to them only as Dr. Davis. The appellant believed that Dr. Davis was a Canadian citizen affiliated with the Nigerian Government. The appellant testified that Dr. Davis requested an additional $20,000 to process the funds coming from Nigeria. Smith and the appellant returned to the United States to collect the funds and returned to Canada the next weekend carrying over $16,000 in cash. The cash was solicited by Smith and the appellant from various individuals in Cheatham County and Humphreys County.

According to the appellant, once in Canada, the appellant and Smith were shown seven cases of allegedly defaced United States currency, money that had been so marked as to be impassable as currency until it had been cleaned. The two men were shown a chemical bath that would convert the defaced money into valid passable currency, and both men were given a cleaned $100 bill as a souvenir. The appellant referred to the process as "dephasing." The appellant and Smith were told that the cleaning solution would cost an additional $69,000; they paid for a portion of the solution but learned several days later, after a snowstorm, that the solution froze and was rendered unfit for use. The Canadian partner then demanded more cash from the appellant and Smith.

Back in the United States again, the appellant contacted his Nigerian lawyer, who told the appellant that the Nigerian government would recall the cash from Canada, then split it with M. McKellar dot com and send him a cashier's check for $10 million. In order to complete the transfer, the lawyer told the appellant that it would cost an additional $8,400 in fees and insurance. The appellant received a copy of a purported cashier's check made out to him for $10 million.

Around that time, another individual, Norma Hailey, joined efforts with Smith and the appellant in an attempt to get the money from the defaulted contract to the United States. Hailey,

Smith, and the appellant continued to solicit funds from investors in Cheatham County and Humphreys County.

The Nigerian lawyer then contacted the appellant and informed him that they were going to attempt to send the entire sum again, this time through a Canadian gentlemen in Toronto named Peter Hall. The lawyer informed the appellant that it would cost $10,000 to get the money to Toronto. Smith and the appellant again traveled to Canada, where they witnessed Peter Hall pick up the funds at the embassy with a diplomatic voucher. While in Canada, Smith and the appellant called the Canadian bank and confirmed that the money was on deposit in their names. They arranged a transfer of the money to Regions Bank in Tennessee. While arranging for the transfer, the two were told that they would need a bond issued in the amount of $68,000. They did not have the money necessary to secure the bond.

The men returned to Tennessee, where they again solicited funds from investors in an attempt to secure the bond. While raising the funds necessary for the bond, Smith and the appellant continued to negotiate with Peter Hall, who demanded $20,000 as a fee. In August of 2001, the appellant and Smith were told that the money was recalled from Canada to Nigeria. For the next several months, the appellant referred to Western Union wire receipts that showed he and Smith sent multiple wire transfers to Nigeria varying from $250 to $5,000. The appellant claims that the money was sent in order to get the appropriate officials to act on the matter and send the contract funds to the Unites States. Sometime later, the appellant was told by his Nigerian lawyer that the German company had done damage to the Nigerian infra-structure and that the appellant would need to send another $250,000 for damages before the $25 million from the contract would be released. The appellant and Smith then sent approximately $20,000 more to Nigeria.

About that time, Mr. Tarpley and a United States Secret Service agent questioned the appellant regarding the oil investment. According to Mr. Tarpley, the Secret Service agent told the appellant that it looked and sounded like a scam. Mr. Tarpley told the appellant not to take any additional money from investors.

At the restitution hearing, the appellant testified that $38,242 was collected from Cheatham County investors by Smith. The appellant maintained that all of the funds collected in Cheatham County were disbursed either through Western Union or by trips to Canada in attempts to get the money from the contract to the United States. The appellant testified that he, Norma Hailey, and Smith collected a total of $44,650 from investors in Humphreys County. Again, the appellant testified that all of the money collected was used to further the business venture.

At the conclusion of the hearing, the trial court ordered the appellant to pay $1,000 in restitution to E.L. Edgin and $22,900 in restitution to Randall Smith, Sr. based on the finding that the appellant had converted this amount of money to his own personal use. The appellant filed a timely

notice of appeal. On appeal, he challenges the trial court's failure to make specific findings regarding his ability to pay restitution and the evidence presented at the restitution hearing.[3]

## Analysis

The appellant argues that the evidence at the restitution hearing was insufficient to prove that he should pay restitution. Specifically, the appellant argues that the State did not prove that he converted the full amount of money ordered in restitution for his own personal use. The State counters that by pleading guilty, the appellant waives consideration of the sufficiency of the evidence. In the alternative, the State argues that the record supports the total ordered by the trial court for restitution.

As an element of sentencing, this court reviews an order of restitution de novo with a presumption of correctness. State v. Johnson, 968 S.W.2d 883, 884 (Tenn. Crim. App. 1997); State v. Thomas Stephen Thrasher, No. 03C01-9904-CC-00144, 2000 WL 156810, at *8 (Tenn. Crim. App. at Knoxville, Feb. 15, 2000) perm. to appeal denied (Tenn. 2001). See also Tenn. Code. Ann. § 40-35-401(d).

The proof at the restitution hearing showed that in Cheatham County, Smith was responsible for collecting money from various investors. Smith then turned over the cash and/or checks to the appellant, who sometimes deposited the money into his personal bank accounts at AmSouth Bank or Firstar Bank. According to the appellant and Mr. Tarpley, E.L. Edgin contributed $9,500 to the venture in January of 2001. Mr. Edgin gave Smith a cashier's check for $4,500. According to bank records, the appellant kept $3,500 in cash and deposited $1,000 into his personal bank account. Mr. Edgin also contributed a $5,000 cashier's check. There is no record of that money being deposited into one of the appellant's accounts. According to the appellant, all of Mr. Edgen's money was wired to Canada.

According to a handwritten receipt, Kathy Stewart, Peggy Boyd and Jeremy Morris contributed $8,500 to the venture on February 23, 2001. Kathy Stewart contributed $5,000, Peggy Boyd contributed $2,000 in a check dated February 22, 2001, and $1,000 in a cash. According to the appellant, $8,400 of this money was wired to Nigeria as insurance for the transfer of the $10 million check from Nigeria. In February, the appellant and Smith took $16,000 in cash to Canada. The

---

[3] After a review of the transcript of the proceedings herein, it appeared that the appellant was placed on judicial diversion pursuant to Tennessee Code Annotated section 40-35-313, but the judgment of conviction reflected a guilty plea to theft of property over $10,000. Tennessee Code Annotated section 40-35-313 which provides for judicial diversion does not contemplate the entry of a judgment of conviction in cases of judicial diversion. See Tenn. Code Ann. 40-35-313(a)(1)(A). Therefore, ordinarily no appeal is permitted in judicial diversion cases. See State v. Norris, 47 S.W.3d 457 (Tenn. Crim. App. 2000); see also Tenn. R. App. P. 3(b). This Court ordered the trial court to clarify the appellant's status on December 28, 2004. In a response received from the trial court on January 27, 2005, the trial court clarified that the appellant was sentenced to a three-year suspended sentence. Therefore, this appeal is properly before this Court.

record contains a handwritten "Independent Credit Commission Receipt of Payment" for $16,000.

The record includes a check from Robert Lill in the amount of $500 dated March 14, 2001. A handwritten receipt acknowledges the receipt of $4,000 from Marietta Hampton on February 27, 2001 and a receipt in the record indicating that James Brown loaned Smith $1,000 on February 23, 2001. The receipts promise a 5 to 1 return on the money and are signed by both the appellant and Smith. There is also a handwritten receipt acknowledging the receipt of $1,000 from Bert and Jo Fowlkes on February 24, 2001.

Another handwritten receipt shows that Randall Smith gave the appellant $15,000 in cash. One day after the appellant received the $15,000 in cash from Randall Smith, he wrote a check to Dickson Mobile Homes for $15,000 as a deposit on a mobile home. According to the appellant, Randall Smith contributed an additional $22,000 in the form of a check made out to the appellant. According to bank records, $18,000 of that money was deposited and the remaining $4,000 was taken as cash. The check to Dickson Mobile Homes was written by the appellant out of the same bank account. Dickson Mobile Homes later sent the appellant's deposit check back. The appellant took $5,000 of that money and opened a savings account at Firstar Bank.

Annette Bowen wrote three checks to the appellant totaling $2,800. Phillip Hicks contributed $2,500, Carroll Smith contributed $2,500, and Donnie Smith contributed $1,500 on May 13, 2001.

Mr. Tarpley testified that there were many other investors that gave money to Smith and the appellant but that there were no receipts for these transactions and many of the other investors were not named in the indictment because they were embarrassed to press charges.

The record includes numerous Western Union money transfer receipts. In January of 2001 $21,635 in wire transfers were sent to an individual named Mary Lee in Canada. The record also includes numerous Western Union transfer receipts with dates from August of 2001 to March of 2002. All of the receipts except for two were made payable to people in Nigeria. The transfers and fees totaled $45,430. Thus, the record indicates that the total of the all of the Western Union transfers to Canada and Nigeria was $67,672.

Between June and December of 2001, $40,307.71 was withdrawn from the appellant's M. McKellar dot com bank account in the form of cash and checks. Several checks were written to the appellant's wife and daughter. There were also checks written to J & P Auto, Jim Lawson,[4] DCHS,[5] Norma Hailey, Tim Adcock, Jonathan Nerner, www World Site, K-Mar Marketing Corporation, and Smith.

---

[4] The checks written to Jim Lawson were for a deposit on a mobile home and lot rent associated with that home.

[5] Mr. Tarpley assumed that DCHS stood for Dickson County High School, where the appellant's daughter was a student.

Tennessee Code Annotated section 40-35-304 sets out the procedures the court must follow in ordering restitution. The trial court "may direct a defendant to make restitution to the victim of the offense as a condition of probation." Tenn. Code Ann. § 40-35-304(a). "Whenever the court believes that restitution may be proper or the victim of the offense or the district attorney general requests, the court shall order the presentence service officer to include in the presentence report documentation regarding the nature and amount of the victim's pecuniary loss."[6] Tenn. Code Ann.§ 40-35-304(b). The amount of restitution that the defendant may be directed to pay is limited to "the victim's pecuniary loss." See Tenn. Code Ann. § 40-35-304(b). The phrase "pecuniary loss" includes:

> (1) All special damages, but not general damages, as substantiated by evidence in the record or as agreed to by the defendant; and
> (2) Reasonable out-of-pocket expenses incurred by the victim resulting from the filing of charges or cooperating in the investigation and prosecution of the offense; provided, that payment of special prosecutors shall not be considered an out-of-pocket expense.

Tenn. Code Ann. § 40-35-304(e). There is no designated formula or method for the computation of restitution but the trial court is required to consider "the financial resources and future ability of the defendant to pay or perform." Tenn. Code Ann. § 40-35-304(d). "The amount of restitution a defendant is ordered to pay must be based upon the victim's pecuniary loss and the financial condition and obligations of the defendant; and the amount ordered to be paid does not have to equal or mirror the victim's precise pecuniary loss." State v. Smith, 898 S.W.2d 742, 747 (Tenn. Crim. App. 1994).

After hearing all of the evidence, the trial court commented on the poor state of the bank records as provided by the various financial institutions involved and acknowledged the "complicating factor" that "the victims listed in these two indictments are only part of the total number of victims in the case." The trial court determined:

> I think it goes without saying . . . if . . . [the appellant] and Smith really believed that they were going to invest this money in this scheme and get back many many times more money than they had invested, and if they communicated that to the people from whom they obtained money, no crime has been committed.
>
>    . . . .
>
> It was naivete, but it was not theft. And the money is just gone. Basically, the truth was told as they knew it, and the monies thus obtained, the investor knew what it was

---

[6]We note that the record does not contain a pre-sentence report accompanied by documentation regarding the nature and amount of the victim's pecuniary loss, as required by Tennessee Code Annotated section 40-5-304(b). However, technical compliance with Tennessee Code Annotated section 40-35-304(b) is unnecessary when the trial court conducts a hearing to determine the amount of restitution. State v. Lewis, 917 S.W.2d 251, 256 (Tenn. Crim. App. 1995).

going for, and that money is lost. But it is not theft. In order to be theft, it has to be converted to a person's own personal use. And if they just took it, they were a conduit and handed it off to somebody else, that's not theft. Now, the argument has been made that they should have known better. That Mr. Smith and . . . [the appellant] are con men. That there was no such scheme. That they were just fleecing these people with the idea that this scam or opportunity existed. It has been proved to my satisfaction that they were naive enough to believe it. There is enough documentation here, the Nigerian checks and so forth, that apparently they were really dealing with somebody. There's no doubt but what they went to Canada a couple of times. . . . I'm of the opinion that these gentlemen actually believed that they were going to get untold millions of dollars for this minimal investment. . . . I think he [the appellant] has sufficient intelligence - - like I say, I think a lot of his intelligence was blinded by greed - - if he was going to lie, he would have done a better job than what he did.

 . . . .

Tracing what wasn't - - what went to the personal use of . . . [the appellant] is considerably more difficult. And I can only order restitution where it has been established that it did, in fact, go to his personal use. And there is no doubt in my mind that some of it did. So I'm going to go down each indictment, each victim, and rule as best I can where I think that money went and whether it shall be repaid. Now, the first is the Cheatham County case, 14017. First listed victim is E.L. Jack Edgen [sic], total amount of Ninety-Five Hundred Dollars. The Court is satisfied from the proof that it has heard that all but a Thousand Dollars went to Canada. That was, I think, taken with him on a trip up there. [The appellant] put a Thousand Dollars into his personal account; that converted that to his own use, and he is - - Mr. Edgen [sic] is entitled to a Thousand Dollars restitution for that amount. Kathy Stewart, Peggy Boyd and Jeremy Morris, Eighty-Five Hundred Dollars total. Given the dates that that was done and the trip to Canada where Sixteen Thousand Dollars was taken on 2-26, the Court is of the opinion that that money was taken to Canada, and there will be no restitution in that amount. Robert Lill, Five Hundred Dollars was given to Mr. Smith and thence to . . . [the appellant]. I can't trace that money to Canada, but I can't trace it into his personal use either. The burden of proof is on the State to show that it was converted to his personal use, and therefore I cannot order restitution. There are three others- Mariette and Vick Hamptom, James Brown and Burt and Jo Fowlkes. . . . All of these were within a day or two of this trip to Canada, and the amount of Sixteen Thousand Dollars, with the Kathy Stewart amount of Eighty-Five Hundred Dollars, works out pretty close to the amount that was taken to Canada. Therefore, the Court rules that these amounts were taken to Canada, were part of the scam, so to speak, were not used by them personally . . . . Therefore, no restitution can be awarded in those amounts. Humphreys County victims . . . Randall Smith, Sr. is a real challenge. But basically, it is established that Thirty-Seven Thousand Dollars was obtained from him. The Court finds that Fifteen Thousand Dollars was paid to a mobile home - for

a mobile home.  Now later, it was reimbursed, but when it was paid for that mobile home, it was converted at that time and used for his personal use . . . .  The Five Thousand Dollars went into the joint account.  Again, converted it to his own expenses and personal use.  And the deposit of two checks totaling Twenty-Nine Hundred Dollars, again I think was a mobile home deposit for the same amount, and those total Twenty-Two Thousand Nine Hundred Dollars.

    . . . .

Randy Smith, Jr., Annette Bowen, Don Smith, Carol Smith, and Phillips and Hicks - - Randall Smith and Annette Bowen, roughly Seventy-Six Hundred Dollars total, Seventy-Six Fifty, there is no documentation of exactly where that went.  But Forty-Five Thousand Four Hundred Thirty Dollars was wired at various times during this period, and obviously, we can't trace any of it into his personal use, so the best I can tell, it went to Canada.  The Don Smith, Carol Smith, and Phillips and Hicks total about Sixty-Five Hundred Dollars was just within one day or two of those twin money orders that went up on May 14th in the - - about Forty-Five Fifty Eight each, two of them, so I find that that's where that money went, and no restitution will be ordered in that situation.

It is explicit in the trial court's statements that the trial court based its order of restitution on the portion of the collected funds that was converted to the appellant's own personal use.  It is imperative to note at the outset of our analysis that the appellant's nolo contendere plea waived all non-jurisdictional, procedural and constitutional defects in the proceedings.  State v. McKissack, 917 S.W.2d 714, 716 (Tenn. Crim. App. 1995) (applying waiver to a guilty plea); State v. Bilbrey, 816 S.W.2d 71, 75 (Tenn. Crim. App. 1991); Teague v. State, 772 S.W.2d 932, 943 (Tenn. Crim. App. 1988) (holding pleas of nolo contendere have same effect as guilty pleas absent statute or rule to contrary).  The appellant's challenge to the sufficiency of the evidence at the restitution hearing, while masked as a challenge to the sentence, is, in reality, a challenge to the sufficiency of the evidence and is an inappropriate subject for review after the nolo contendere plea.  The appropriate issue for determination at the restitution hearing was not whether or how much of the property the defendant converted to his own use, the question for the trial court at this point was to determine the extent of the pecuniary loss for each respective victim.  The restitution hearing was not the appropriate place for the appellant to attempt to re-litigate the facts underlying the nolo contendere plea.  As part of the plea agreement, the appellant agreed to distribute restitution on a "prorata basis among the different victims in the different counts, even those being nolled."  It is clear from the record that the trial court failed to correctly determine the amount of restitution.  Given the state of the record, namely the omission of the indictment from Humphreys County, it is impossible for this Court to determine the appropriate amount of restitution.  It is the duty of the appellant to provide an adequate record for review.  Tenn. R. App. P. 24(b).  Accordingly, we must remand the matter for a new restitution hearing in which the trial court determines the actual pecuniary loss of each victim named in the original indictments.

Further, after a review of the record, it appears that the trial court failed to determine the appellant's ability to pay restitution in accordance with Tennessee Code Annotated section 40-35-304. Consequently, we have no choice but to remand the matter for a new sentencing hearing in which the trial court orders restitution based on each individual victim's actual pecuniary loss and a determination of the appellant's ability to pay restitution.

## Conclusion

For the foregoing reasons, we reverse the judgment of the trial court and remand for a new restitution hearing.

_____
JERRY L. SMITH, JUDGE